UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                          :

ANTHONY MAYES,              :
                          :

               Plaintiff,     :

                          :

            v.             :

                          :

UNITED STATES OF AMERICA,    :
                          :

             Defendant.  :
                          :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 5, 2018

15 Civ. 7155 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Anthony Mayes, proceeding *pro se*, brings this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), and the Fifth and Eighth Amendments to the United States Constitution, alleging that while in the custody of the federal government as a pretrial detainee, a dentist employed by the Government performed dental surgery on Plaintiff that caused him injuries. Liberally construed, Plaintiff's tort claims include causes of action for medical malpractice, battery, and undergoing a medical procedure without informed consent. The Government now moves to dismiss the constitutional, battery, and informed-consent claims for lack of jurisdiction, and moves for summary judgment on the medical malpractice claim. For the reasons that follow, the Court grants the motion.

# BACKGROUND[1]

## A. Factual History

### 1. Plaintiff's Dental Surgery

#### a. Prior Treatment

Plaintiff underwent the dental surgery at issue while a pretrial detainee at the Metropolitan Correctional Center ("MCC") in Manhattan, but his medical records evidence earlier problems with the affected wisdom tooth. (*See* Def. Br. 1). On December 31, 2012, for example, while detained at another Bureau of Prisons ("BOP") facility, Plaintiff was treated by Dr. Dinesh Patel for pain and swelling in the same rear wisdom tooth, which is referred to in dental nomenclature as the #17 tooth. (*See* Med. Recs. 405-06). On that date, Dr. Patel prescribed Plaintiff painkillers, anti-inflammatories, and antibiotics to treat a possible infection; he also noted that the tooth might later require

---

[1]  The Court draws its facts from the Complaint ("Compl." (Dkt. #1)), to which the Court refers by the page numbers assigned by the Court's electronic case filing ("ECF") system, and the parties' submissions in connection with the motion for summary judgment and to dismiss. The latter category includes the following exhibits attached to the Declaration of Jennifer Jude (Dkt. #94): Plaintiff's medical records ("Med Recs. [ ]" (Dkt. #94-7)), which are referred to using the page numbers assigned by the Government; Dr. Kenneth Cho's Curriculum Vitae ("Cho CV" (Dkt. #94-14)), which is also referred to using the page numbers assigned by the Government; the deposition transcripts of Plaintiff ("Pl. Dep." (Dkt. #94-1)), Dr. Kenneth Cho ("Cho Dep." (Dkt. #94-3)), Dr. Dinesh Patel ("Patel Dep." (Dkt. #94-2)), Dr. Andrea Schreiber ("Schreiber Dep." (Dkt. #94-4)), Dr. Alan Schwimmer ("Schwimmer Dep." (Dkt. #94-5)), and Dr. Michael Weiss ("Weiss Dep." (Dkt. #94-7)); and the expert reports of Dr. Schwimmer ("Schwimmer R." (Dkt. #94-8)), Dr. Schreiber ("Schreiber R." (Dkt. #94-9)), and Dr. Weiss ("Weiss R." Dkt. (#94-10)), as well as Dr. Schreiber's rebuttal report ("Schreiber Reb. R." (Dkt. #94-12)). These expert reports are also referred to using the page numbers assigned by the Government. In addition, the Court refers to the Memorandum of Law in Support of the Government's Motions as "Def Br." (Dkt. #93), Plaintiff's Opposition to the Motions as "Pl. Opp." (Dkt. #97), the Government's Reply to Plaintiff's Opposition as "Def. Reply" (Dkt. #99), and the Government's Local Rule 56.1 Statement as "Def. 56.1" (Dkt. #95).

extraction.  (*See id.*).  Plaintiff thereafter had no issues with the tooth until February 2014.  (Pl. Dep. 47:19-48:4).

### b.    Plaintiff's Treatment with Dr. Kenneth Cho

On April 11, 2014, Plaintiff reported to the MCC Dental Clinic to receive treatment from Dr. Kenneth Cho, who at the time served as BOP's Regional Dental Consultant.  (*See* Med. Recs. 366-68; Pl. Dep. 15:10-16:4; Cho Dep. 76:21-80:9; Cho CV 896).  Upon arrival, Plaintiff reported to Dr. Cho that he was experiencing pain and swelling near the #17 tooth.  (*See* Med. Recs. 366; Pl. Dep. 15:14-16).  Based on this complaint, Dr. Cho examined Plaintiff and found pericoronitis, or inflammation of the tissue surrounding an erupting or partially erupted tooth, in the area of the #17 tooth.  (Med. Recs. 366-67; Cho Dep. 87:1-14).[2]  After ordering x-rays of Plaintiff's teeth, Dr. Cho determined that Plaintiff's #17 tooth was "horizontally impacted with gross coronal decay," and that the #18 tooth presented a diffused cyst, meaning that the space around the tooth was collecting tissue and required cleaning.  (Med. Recs. 366; Pl. Dep. 15:22-23; Cho Dep. 89:2-90:16).  Dr. Cho then informed Plaintiff that the #17 tooth required extraction.  (*See* Pl. Dep. 15:23-25; Cho Dep. 94:8-13).

Dr. Cho's notes state that Plaintiff was "extremely nervous" about the procedure (Med. Recs. 366), and Plaintiff himself testified at his deposition that he asked whether Dr. Cho could provide any other treatment, such as

---

[2]    Plaintiff testified during his deposition that Dr. Cho also stated that the tooth "was infected" and that "he put [that] on the paper" (Pl. Dep. 77:4-78:2), but the record of the visit reflects no such diagnosis (*see* Med. Recs. 366-68).

antibiotics or medication, as an alternative to extraction (Pl. Dep. 15:25-16:8). (*See also* Cho Dep. 94:14-23 (Plaintiff "showed … nervousness … beyond the norm" and "for me to write that down, he had to have been a lot more than the norm. So, in my opinion, he looked extremely nervous, so I just wrote that down.")). Plaintiff also testified that though he was averse to "surgery … because of the pain that [he] was in," he consented to surgery because Dr. Cho stated that if Plaintiff refused the procedure, it "could result in a disciplinary [action]" against him. (Pl. Dep. 16:5-12; *see also* Compl. 6 ("Dr. Cho, in haste, told [P]laintiff that if he refused to have the extraction done immediately, [P]laintiff could be written up for a Disciplinary Action (due to refusal to treatment)" and "[d]ue to fear of disciplinary action, [P]laintiff succum[b]ed to the coercion.")). In any event, before beginning the procedure, Plaintiff signed a form listing "[p]ossible complications" associated with the extraction. (Med. Recs. 372; *see* Pl. Dep. 79:18-23). Those complications included "[c]ontinued or increased pain"; "[s]welling and infection"; "[n]erve injury, paresthesia, or residual numbness which may be of undeterminable duration or even permanent"; and a "[d]ecision to leave a small piece of tooth root in the jaw when its removal would increase the risk of complications." (Med. Recs. 372).

### c.   The Attempted Extraction

The parties offer divergent accounts of Dr. Cho's attempt to extract Plaintiff's troublesome tooth. According to the Government, at the outset of the procedure, Dr. Cho injected Plaintiff with lidocaine, a local anesthetic. (Med. Recs. 366-67; Cho Dep. 123:17-22; *see also* Pl. Dep. 16:16-18, 157:21-25).

Although Dr. Cho maintains that he performed tests to determine that the anesthesia was effective (*see* Cho Dep. 119:5-120:9), Plaintiff testified, at times, that the anesthesia failed (*see, e.g.*, Pl. Dep. 158:13-14 ("That [anesthetic] didn't take no effect. I still felt the pain.")). At other times, however, Plaintiff admitted that the anesthesia was effective. (*Id.* at 18:8-24 ("[M]y whole face was numb because [Dr. Cho] kept pumping the [anesthetic] … inside my jaw.")).

After anesthetizing Plaintiff, Dr. Cho made an incision along the tissue to expose the impacted tooth. (*See* Med. Recs. 367; Cho. Dep. 123:25-124:2, 126:17-25). Because the tooth was horizontal and thus not positioned to be lifted from the jaw vertically, Dr. Cho began sectioning the crown of the tooth from the roots. (*See* Med. Recs. 367; Cho Dep. 124:8-10, 127:6-9). At that point, Dr. Cho noted that Plaintiff began showing signs of increased anxiety, including heavy breathing and fidgeting. (Cho Dep. 124:10-15, 128:5-7). Dr. Cho thus aborted the procedure, his notes stating that he did so because of "high anxiety" and a "possible [vaso]vagal syncopy," which Dr. Cho characterized as a condition in which a patient stops breathing out of nervousness or anxiety. (Med. Recs. 367; Cho Dep. 139:11-22). Dr. Cho testified that Plaintiff never indicated that he wished to abort the procedure but, rather, that Dr. Cho "made the call." (Cho Dep. 134:8-15).

Out of concern for Plaintiff's condition, Dr. Cho summoned a physician, Dr. Anthony Bussanich, for a medical evaluation. (*See* Med. Recs. 315-18; Cho Dep. 132:10-15). Dr. Bussanich's notes reflect that he reported "as [an]

emergent follow up after [Plaintiff] experienced a possible vasovagal reaction while undergoing a difficult tooth extraction." (Med. Recs. 315). The notes also state that Dr. Cho reported Plaintiff as being tense and hyperventilating throughout the procedure, experiencing "mild 'spasms' or 'tightening' of the wrists and possibly feet," and that Plaintiff "was not very talkative … but confirmed what Dr. Cho related." (*Id.*). Plaintiff was then transported by wheelchair to urgent care for a more comprehensive examination, after which Dr. Bussanich assessed Plaintiff as suffering from "possible hyperventilatory syndrome and vasovagal response." (*Id.* at 316-17). Dr. Cho's notes reflect that he informed Plaintiff that the remaining "root fragments will not [be] removed and will be evaluated at [a] later time," and that his "medical evaluation revealed no significant findings." (*Id.* at 367).

Plaintiff presents a different version of the surgery. In his recollection, he could feel pain from the procedure despite being anesthetized, and consequently, he "started shaking" and "couldn't breathe." (Pl. Dep. 16:16-21, 73:17-18). Plaintiff therefore "asked [Dr. Cho] for some type of help," after which Plaintiff summoned Dr. Bussanich. (*Id.* at 16:20-22). When Dr. Bussanich arrived, he "asked what was going on and [Plaintiff] told [Dr. Bussanich] that [he] could still feel" the incisions in his mouth. (*Id.* at 16:23-25). Dr. Bussanich then left the room and Plaintiff informed Dr. Cho that he no longer wanted to undergo the procedure. (*Id.* at 16:25-17:2). But to Plaintiff's dismay, Dr. Cho "insist[ed] on still going and trying [to] take out whatever tooth was left[.]" (*Id.* at 17:2-5). Dr. Cho then injected Plaintiff with

more anesthetics "for about the fifth[ or] sixth time," at which point Plaintiff's "body started shaking, [his] feet started cramping up, [he started] tightening up at the wrist and ... hands," and he "couldn't breathe and ... almost passed out" and "started crying." (*Id.* at 74:2-7). It was not until then that Plaintiff was taken by wheelchair to see Dr. Bussanich once more for further medical evaluation. (*Id.* at 18:5-11, 74:7-8).

### 2. Plaintiff's Alleged Injuries and Subsequent Medical Treatment

As relevant to the remaining discussion of the facts in this case, Plaintiff seeks damages of $5 million for an alleged loss of hearing in his left ear and the pain he experienced during surgery. (*See* Compl. 3-4, 9). During his deposition, Plaintiff also claimed that Dr. Cho's malpractice caused numbness around the #17 tooth after the surgery. (Pl. Dep. 110:2-111:16). This section discusses the subsequent medical treatment Plaintiff received to address his dental and auditory complaints.

#### a. Dental Treatment

##### i. April 23, 2014 Medical Evaluation

Twelve days after his dental surgery, Plaintiff reported to a medical examination with MCC medical providers Dr. Robert Beaudouin and Physician's Assistant T. Mitchell ("P.A. Mitchell"). (Med. Recs. 209-12). At the examination, Plaintiff reported that the pain and discomfort associated with his dental surgery persisted, and also that he experienced "decrease[d] hearing on [his] left side," which he was "aware ... may be associated with his [d]ental complaint." (*Id.* at 209-10). P.A. Mitchell's notes from the examination

provide, however, that Plaintiff's "hearing appear[ed] to be conversation appropriate" and that his "ear exam is within normal limits." (*Id.*). Plaintiff also reported that the pain in his tooth and jaw persisted after surgery. (*Id.*). Before his discharge, Plaintiff agreed to take Motrin and Tylenol for tooth pain. (*Id.* at 210).

### ii.    April 25, 2014 Dental Evaluation

Shortly after his medical evaluation, on April 25, 2014, Plaintiff visited Dr. Patel, who had previously treated Plaintiff. (*See* Med. Recs. 253). Dr. Patel's notes from his evaluation provide that Plaintiff complained of pain and swelling near the impacted tooth. (*Id.*). Dr. Patel noted that the roots of the tooth "present[ed] deep inside the socket close to [the] mandibular canal," which required "surgical extraction by [a] specialist." (*Id.*). Dr. Patel later testified that such specialist would include an "[o]ral surgeon or experienced dentist with experience of doing impaction," and that although Dr. Cho was not an oral surgeon, he had performed enough impactions to be qualified to perform the surgery. (Patel Dep. 83:13-21, 87:17-24). But because Dr. Cho was unavailable, Dr. Patel referred the surgery to Dr. Mordechai Hoschander, who was an oral surgeon. (*Id.* at 95:23-96:5; *see* Med. Recs. 253, 310).

### iii.    May 2, 2014 Extraction

Following Dr. Patel's referral, on May 2, 2014, Dr. Hoschander extracted the remnants of Plaintiff's impacted tooth. (Med. Recs. 304-10). Plaintiff testified that the procedure was successful and that he experienced no pain during the surgery. (Pl. Dep. 108:1-13). He was then prescribed painkillers

and antibiotics.  (*Id.* at 108:16-109:8; Med. Recs. 304-09).  Three days later, P.A. Mitchell tended to Plaintiff and reported that he was "[c]oming along fine after [the] procedure."  (Med. Rec. 201).

### b. Audiological Treatment

### i. June 25, 2014 Examination

Plaintiff's first audiological examination was on June 25, 2014, at the Kingsbrook Jewish Medical Center.  (*See* Med. Recs. 288).  His treating audiologist, Dr. Jo Ann Nicholas, first performed otoacoustic emissions testing[3] that showed "strong stapedial muscle reflexes," i.e., repeated *involuntary* responses, "in both ears," which stood in stark contrast to Plaintiff's failure to provide any *voluntary* responses to stimulation of his left ear.  (*Id.*).  Dr. Nicholas therefore theorized that Plaintiff was feigning his hearing loss, finding that the testing "consistently indicated a functional hearing loss in the left[ ear], with essentially normal hearing in both ears."  (*Id.* at 278).[4]  To test Plaintiff's functional hearing loss, Dr. Nicholas performed a Speech Stenger Test,[5] which Plaintiff failed, "indicating functional hearing losses[] at levels that

---

[3]    The Government's medical expert on the issue of Plaintiff's alleged hearing loss described otoacoustic emissions testing as "depend[ant] on electrical emissions from the inner ear in response to an auditory stimulus," which response is "involuntary, and the level of emissions correlates strongly with hearing loss or the absence of hearing loss." (Weiss R. 1118).

[4]    Defendant's medical expert on the issue of Plaintiff's alleged hearing loss, Dr. Michael Weiss, testified that "functional hearing loss" is "a hearing loss that does not appear to have an organic basis," including "feigned hearing loss."  (Weiss Dep. 40:11-17, 41:23-25).

[5]    Dr. Weiss described the purpose of the Stenger Test as follows:

   Stenger testing is a test designed to "catch" individuals who feign hearing loss.  It relies on the Stenger effect — the phenomenon that a test subject who is exposed to the same tone in both ears experiences hearing the tone only in the ear in which the tone is

suggested hearing is equally symmetric and essentially within normal limits in both ears." (*Id.* at 288). After his evaluation, Dr. Nicholas advised Plaintiff that her evaluation was "consistent with normal hearing bilaterally" and although "pain may remain around the surgical site, … hearing is not impacted." (*Id.*).

### ii.    November 5, 2014 Evaluation

On November 5, 2014, Plaintiff returned to Dr. Nicholas for a further evaluation. (*See* Med. Recs. 278). On that date, Plaintiff related a "significant hearing loss in both ears," and "[i]n the 'poorer' left ear," Plaintiff volunteered no responses "at limits of output for both tones and speech, indicating essentially a dead ear, *despite reflexes that were obtained well below those levels*." (*Id.* (emphasis added)). Again contrary to Plaintiff's subjective reports, the objective data Dr. Nicholas obtained indicated "normal middle ear function in both ears with present reflexes of normal duration in both ears" and "essentially normal and equal hearing in both ears." (*Id.*). Based on this data, Dr. Nicholas concluded that Plaintiff continued to present functional hearing loss and "normal hearing sensitivity in both ears," and she recommended that, "[i]f additional testing is needed," Plaintiff should "be seen at some other

---

louder. For example, if a patient is claiming hearing loss in the left ear and is presented with a moderate sound in the right ear and a loud sound in the left — if he really is deaf in the left ear he will respond to the stimulus by saying that he hears sound on the right side. If he is malingering however, he actually experiences the sound on the left side only, and will state that he doesn't hear anything at all. In the skilled hands of an audiologist[,] the Stenger test is an excellent tool for uncovering deception.

(Weiss R. 1118).

hearing facility, in order to give him a 'fresh' start with his volunteered responses." (*Id.*).

### iii.    Treatment at Canaan Penitentiary

On April 9, 2015, after being transferred to United States Penitentiary Canaan in Waymart, Pennsylvania, Plaintiff received a medical evaluation during which he complained that he could not "hear out of his left ear." (Med. Recs. 163; *see* Def. Br. 10).  He was seen again on June 11, 2015, and complained of pain and "decreased hearing" in his left ear, after which he was referred to receive an in-house audiogram.  (Med. Recs. 113, 115).  Plaintiff's medical records reflect, however, that on August 10, 2015, he was "unable to complete" and "failed" the audiogram; Plaintiff was thus recommended to receive a formal audiological consult.  (*Id.* 109-10, 154).

Plaintiff was treated again on October 19, 2015, but complained of *right* ear pain.  (Med. Recs. 106-07).  During another appointment on November 9, 2015, his complaints shifted back to his left year, which he stated suffered from hearing loss.  (*Id.* at 103).  Four days later, Plaintiff underwent an MRI of his brain, which proved "[u]nremarkable."  (*Id.* at 150).

On December 2, 2015, Plaintiff received an audiological exam from an outside provider, Dr. Philip G. Liu.  (*See* Med. Recs. 147-48).  Dr. Liu concluded that Plaintiff was experiencing "folliculitis" in his left ear, which according to Defendant's medical expert is a pimple in the ear canal outside of the eardrum.  (*Id.*; *see* Weiss Dep. 78:21-79:3).  Notably, Dr. Liu found "no

significant sensorineural hearing loss" and that "[a]udiometric testing with inconsistency suggested" that Plaintiff was "unreliab[le]." (Med. Recs. 148).

### iv. Treatment at Lee Penitentiary

After being transferred to United States Penitentiary Lee in Pennington Gap, Virginia, Plaintiff was treated again and complained of "pain in [his] left ear [for] about a month" and "ringing in [his] ear" that had lasted "for about [two] years." (Med. Recs. 603; *see* Def. Br. 11). The treating medical professional advised that those conditions could be the result of "earwax blockage" and ordered Plaintiff to use over-the-counter earwax remover. (Med. Recs. 604).

### 3. Expert Medical Opinions

The parties each proffer expert medical opinions on Plaintiff's alleged injuries and their relation, if any, to Plaintiff's April 11, 2014 surgery. Specifically, Plaintiff has offered the opinion of Dr. Alan Schwimmer, an oral and maxillofacial surgeon, to address whether Dr. Cho satisfied the standard of care. For its part, the Government has offered the opinions of two medical experts: Dr. Andrea Schreiber, an oral and maxillofacial surgeon, to opine on whether Dr. Cho satisfied the standard of care; and, as mentioned above, Dr. Michael Weiss, an ear, nose, and throat specialist, to opine on Plaintiff's claimed hearing loss. In this section, the Court summarizes their opinions.

### a.    Dr. Alan Schwimmer

Dr. Schwimmer, a board-certified oral and maxillofacial surgeon, opined that Dr. Cho breached the standard of care in five respects:

*First*, Dr. Cho "failed to take a preoperative panoramic radiograph" before attempting the surgery.  (Schwimmer R. 20).  Instead, Dr. Cho took a periapical radiograph, which "did not allow for sufficient evaluation of the impacted tooth."  (*Id.*).  During his deposition, Dr. Schwimmer described the differences between the two radiography methods as follows:

> [A] panoramic radiograph would give you a perspective and a more accurate perspective or picture, if you will, a demonstration or illustration of the position of the inferior alveolar nerve canal to the apices of the tooth, and it will give you a more or a clearer perspective of the position of the roots and whether or not there are bulbous roots involved, and it will give you a clearer perspective of the degree of or the relationship of the ascending ramus of the impacted tooth.
>
> ***
>
> [A] perioapical radiograph for the removal of a tooth such as [Plaintiff's], even though it may show the apices of the teeth, [] still carries … a degree of distortion that makes the surgical planning inaccurate or doesn't give an adequate presentation or representation as to the nature of the impaction and its relationship to the inferior alveolar nerve canal, and/or the size and shape of the roots adjacent and[/]or connected to the tooth.

(Schwimmer Dep. 236:7-17, 237:12-22).  In Dr. Schwimmer's view, an "[a]dequate radiographic evaluation" for Plaintiff's surgery would "require[] visualization of the apices of the impacted too[th] as well as at least 1 mm of the bone surrounding the apices," which Dr. Cho's periapical radiographs did not provide.  (Schwimmer R. 20).

*Second*, Dr. Cho "failed to make the appropriate incision … to allow proper exposure of the tooth." (Schwimmer R. 20). Instead, Dr. Cho should have utilized an incision "that stays on the lateral surface of the mandible, using the external oblique ridge as the medial landmark." (*Id.* at 19). Dr. Schwimmer explained during his deposition that "[a] mid-crestal incision will never allow you access to the underlying mandible in a way that gives you adequate exposure of the external oblique ridge, the bone posterior to the crown of the impacted tooth, and it will place the lingual nerve at greater risk." (Schwimmer Dep. 204:15-21).

*Third*, Dr. Cho "failed to do any ostectomy," *i.e.*, bone removal, "prior to attempting sectioning of the tooth and, as a result of the inadequate exposure he did not section the crown in the appropriate manner." (Schwimmer R. 20; *see id.* at 18). In Dr. Schwimmer's view, because "[t]he entire tooth or 95 percent of the tooth [was] encumbered by the surrounding bone and by the bone of the ascending ramus, of the mandible," Plaintiff's surgery "require[d] more of an ostectomy" than Dr. Cho performed. (Schwimmer Dep. 176:21-26).

*Fourth*, Dr. Cho "began the surgical procedure without any preoperative planning." (Schwimmer R. 20). Dr. Schwimmer based this opinion "on page 61 of [Dr. Cho's] deposition," in which Cho "testified that a surgeon wouldn't know how difficult a procedure could be until the procedure had started." (*Id.*).[6]

---

[6]    The colloquy leading to this testimony reads as follows:

Q.    Assuming all other factors are constant, then would a horizontally impacted tooth be more difficult?

A.    Not necessarily.

During his deposition, Dr. Schwimmer added that the radiograph of the surgery also indicated that Dr. Cho "for some reason, … fractured off this small fragment of tooth," which indicated to Dr. Schwimmer "that [Dr. Cho] had no plan." (Schwimmer Dep. 225:23-226:15).

*Fifth*, Dr. Cho "elected to perform a surgical procedure for which he was inadequately trained and had inadequate experience." (Schwimmer R. 20). In Dr. Schwimmer's opinion, the impaction of Plaintiff's tooth was so severe that its extraction required a "surgeon who has advanced training and repeated experience with procedures of this degree of complexity." (*Id.* at 18). But "Dr. Cho's curriculum [v]itae and deposition testimony did not demonstrate any advanced oral surgery training, education, or credentials applicable to his treatment of Mr. Mayes." (*Id.*).

These are the ways in which Dr. Schwimmer believed that Dr. Cho may have departed from the relevant standard of care. But what is striking to any reader of Dr. Schwimmer's expert opinions is what he claims — and disclaims — regarding any causal connection between the departures and Plaintiff's claimed injuries. Dr. Schwimmer opined that "the departures from these standards of care were the proximate cause of Dr. Cho's failure to complete the procedure on April 11, 2014." (Schwimmer R. 21). This, in turn,

---

Q. What would it depend on?

A. You wouldn't know exactly until you actually, basically, started the procedure. There are other circumstances that may make a procedure difficult.

(Cho Dep. 61:16-24).

led to a "second procedure for the removal of tooth #17," which, according to

Dr. Schwimmer, "undoubtedly increased the postoperative morbidity

associated with the extraction of tooth #17," and "increase[d] the chances of

causing acute pain and temporary or permanent numbness in the area of the

surgery, as well as pain and numbness in the jaw." (*Id.*).[7] Crucially, however,

Dr. Schwimmer admitted during his deposition that any morbidity Plaintiff

suffered was limited to that experienced "through a procedure that was

traumatic for him," and that Dr. Cho's actions did not cause post-operative

morbidity or even "prolonged morbidity." (Schwimmer Dep. 262:10-20).

Dr. Schwimmer also stated during his deposition that he believed

Plaintiff's buccal nerve was damaged during his dental surgeries, leading to the

numbness of which Plaintiff complained during his deposition. (*See*

Schwimmer Dep. 262:22-24).[8] But Dr. Schwimmer could not determine

whether Dr. Cho or Dr. Hoschander caused such damage. (*See id.* at

263:3-22). Indeed, Dr. Schwimmer testified that he was not of the opinion that

any of Dr. Cho's alleged breaches was the proximate cause of either Plaintiff's

alleged numbness or hearing loss. (*Id.* at 286:12-287:15).

Dr. Schwimmer also admitted that it was "possible" that even absent the

departures from the standard of care identified in his report, Dr. Cho "would

not have been able to complete the procedure because of the distress or pain

---

[7]     Dr. Schwimmer defined "post-operative morbidity" as "prolonged pain and discomfort or infection or anything of that nature." (Schwimmer Dep. 262:6-7).

[8]     According to Dr. Schwimmer, the buccal nerve "crosses the anterior surface of the mandible and then travels into the buccal vestibule." (Schwimmer Dep. 263:12-14).

that [Plaintiff] was in." (Schwimmer Dep. 249:17-22). Indeed, he admitted that continuing a surgical procedure after a patient had requested to stop would violate the standard of care because it would "force the patient to do something they are unwilling to do." (*Id.* at 260:22-261:14).

### b.   Dr. Andrea Schreiber

On behalf of the Government, Dr. Andrea Schreiber, a board-certified oral and maxillofacial surgeon (*see* Schreiber Dep. 23:9-11), presented a report that rebutted Dr. Schwimmer's opinion in the following respects:

*First*, Dr. Cho testified that he would not have started the surgery without a "diagnostic radiograph," and the standard of care did not require that such radiograph be panoramic. (Schreiber Reb. R. 1126). During her deposition, Dr. Schreiber explained that a radiograph is "diagnostic" if it shows "the full tooth, plus the association of any related pathology and the full extent of that, if it exists, and relationship to any associated anatomical structures, if [such] condition exists." (Schreiber Dep. 160:7-12). Because Dr. Cho testified that he had taken such a radiograph, Dr. Schreiber opined that he had not breached the standard of care in this regard, yet she admitted that the radiographs in the record that she had reviewed were not diagnostic. (*Id.* at 168:15-169:3).[9]

*Second*, Dr. Cho did not fall below the standard of care with respect to his method of incision. According to Dr. Schreiber, "the lateral incision

---

[9]   During his deposition, Dr. Cho suggested that the radiographs produced in this litigation may not have included all of the radiographs that he took before performing Plaintiff's surgery. (*See* Cho Dep. 108:4-113:9).

approach," championed by Dr. Schwimmer, "is favored in order to avoid lingual nerve injury in the small percentage of patients with an aberrant lingual nerve course, which crosses over the ridge." (Schreiber R. 1097). But Plaintiff "did not suffer a lingual nerve injury." (*Id.*).

*Third*, "how and where Dr. Cho sectioned the crown is not relevant as the procedure was stopped before the crown was fully removed and before the roots were sectioned or elevated." (Schreiber R. 1097). Dr. Schreiber expanded on this during her deposition, stating that the medical record did not show whether Dr. Cho performed an ostectomy, but even if it did, it would be irrelevant because Dr. Cho aborted the surgery. (*See* Schreiber Dep. 206:2-12).

*Fourth*, Dr. Schreiber's opinion "that Dr. Cho started the procedure 'without any preoperative planning'" is "a misrepresentation of the factual record." (Schreiber R. 1096). Dr. Schreiber based this opinion on Dr. Cho's testimony that "indicated that it is his custom and practice to evaluate his patients pre-operatively, that he does not start procedures without diagnostic radiographs, and that multiple factors impact on the level of difficulty of any particular procedure, as individual patients and circumstances vary." (*Id.*).

*Fifth*, "Dr. Cho had sufficient training and experience to have reasonably believed that he could successfully perform the procedure." (Schreiber R. 1097). This opinion was based on Dr. Schreiber's grasp of Dr. Cho's "surgical training and experience," as well as his "testimony that he had performed at least 200 (and probably more than 300) extractions of horizontally impacted teeth." (Schreiber Reb. R. 1126 (citing Cho Dep. 43-44)).

### c.    Dr. Michael Weiss

Also on the Government's behalf, Dr. Weiss, a board-certified otolaryngologist (an ear, nose, and throat specialist), provided an expert opinion on Plaintiff's claimed hearing loss.  (*See* Weiss R. 1116).  Of note, Dr. Weiss opined that "no hearing loss actually exists in" Plaintiff, based on the tests that Dr. Nicholas and Dr. Liu conducted that "arriv[ed] independently at similar conclusions." (*Id.* at 1118).  Dr. Weiss explained, "Dr. Nicholas was able to diagnose functional hearing loss on the basis of [a] full battery of tests," and though "Dr. Liu did not conduct as sophisticated testing, ... his conclusion was based upon [Plaintiff]'s unreliability, which translates as a patient giving different and divergent responses to the same stimulus, raising suspicion of malingering." (*Id.*).  "Moreover," Dr. Weiss elucidated, "although drilling on the jaw always carries the remote potential of affecting hearing, this complication is exceedingly rare," and "occurs in fewer than 1/10,000 cases." (*Id.*).

## B.    Procedural History

Plaintiff's first litigation regarding the April 11, 2014 surgery was also filed in this Court.  *See Mayes* v. *DDS K. Cho*, No. 14 Civ. 4383 (KPF).  There, Plaintiff brought claims under 42 U.S.C. § 1983, alleging that as a result of Dr. Cho's surgery, he had experienced pain and suffering and hearing loss in his left ear.  (14 Civ. 4383, Dkt. #17).  Because the suit arose from Plaintiff's medical procedures in a federal rather than state facility, the Court construed Plaintiff's claims as asserting constitutional violations against federal actors under *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics*,

403 U.S. 388 (1971). (14 Civ. 4383, Dkt. #5). The defendants in Plaintiff's first action announced their intent to move to dismiss the complaint because, among other things, Dr. Cho was a member of the Public Health Service ("PHS") and was thus entitled to absolute immunity under 42 U.S.C. § 233(a), which makes the FTCA the exclusive basis for bringing a claim against a PHS member related to their medical or dental service. (14 Civ. 4383, Dkt. #40). Following a May 6, 2015 conference to address the anticipated motion, the Court ordered that case stayed to allow Plaintiff to file another action under the FTCA. (14 Civ. 4383, Dkt. #56).

On September 9, 2015, Plaintiff filed the instant action, in which he brings claims against the United States under the FTCA for his April 11, 2014 dental surgery. (Dkt. #1). The Complaint also includes claims under the Fifth and Eighth Amendments of the United States Constitution. (*Id.*). The Complaint in this action followed an administrative claim that Plaintiff had filed on March 2, 2015, which the Department of Justice denied on August 31, 2015; the administrative claim alleged that "Dr. Cho … deliberate[ly]" tried to pull an impacted wisdom tooth "that was infected without giv[ing] [Plaintiff] the proper medication to clean the infection before pulling the tooth and it cause[d] [Plaintiff] 'hearing loss.'" (Dkt. #19-2; *see* Dkt. #19-4). Later in the litigation, on February 27, 2017, the Court construed post-discovery communications from Plaintiff so as to amend his Complaint "to add as an injury the persistent numbness in the back of Plaintiff's mouth." (Dkt. #75).

After Defendant answered the Complaint in this action (Dkt. #15), the Court granted in part Plaintiff's request for *pro bono* counsel to provide limited-purpose counsel for discovery (Dkt. #34). The parties thereafter completed fact discovery on December 19, 2016, and expert discovery on February 2, 2017. (*See* Dkt. #53). The Government filed the instant motion for summary judgment and dismissal of certain claims for lack of subject matter jurisdiction on May 19, 2017. (Dkt. #92-95). Plaintiff opposed the motion on June 7, 2017, but did not specifically oppose or otherwise respond to the Government's Local Rule 56.1 Statement. (*See* Dkt. #97). The Government replied to Plaintiff's Opposition on July 21, 2017 (Dkt. #99), after which Plaintiff requested an opportunity to supplement his Opposition to the motion (Dkt. #100). The Court granted the request (Dkt. #101), and on August 28, 2017, the Court received Plaintiff's Supplemental Opposition (Dkt. #105).

The Supplemental Opposition includes as an attachment administrative claims that Plaintiff avers to have filed with the BOP on February 19, 2017, March 20, 2017, and April 29, 2017, alleging that "Dr. Cho and [the United States] violated informed consent N.Y. Pub[lic] Health Law § 2805-D by failing to take a panoramic x-ray prior to the extraction of tooth #17 and violated the standard of care for treatment and injured [Plaintiff]." (Dkt. #105). The Government responded to Plaintiff's Supplemental Opposition on October 13, 2017. (Dkt. #106).

**DISCUSSION**

The Government raises two distinct legal vehicles to dispose of Plaintiff's claims. *First*, the Government moves to dismiss certain of Plaintiff's claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Second*, the Government moves for summary judgment on Plaintiff's medical malpractice claim under Federal Rule of Civil Procedure 56. The Court addresses these issues in turn.

**A. The Court Lacks Jurisdiction over Plaintiff's Constitutional, Battery, and Informed-Consent Claims**

The Government's Rule 12(b)(1) motion targets Plaintiff's claims for constitutional violations, battery, and lack of informed consent. Although it urges the Court to dismiss all of these claims for lack of jurisdiction, the Government provides separate reasons as to why the Court lacks jurisdiction over each claim. For the reasons provided in the remainder of this section, the Court agrees with the Government.

**1. Applicable Law**

**a. Motions to Dismiss Under Rule 12(b)(1)**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In resolving a Rule 12(b)(1) motion, "the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain* v. *Karim*, 838

F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (quoting *Makarova*, 201 F.3d at 113).

### b.     The FTCA's Waiver of Sovereign Immunity

Where, as here, the United States is named as a defendant, the doctrine of sovereign immunity may present a jurisdictional bar to suit. *See FDIC* v. *Meyer*, 510 U.S. 471, 475 (1994). "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block* v. *North Dakota ex rel. Bd. of Univ. and School Lands*, 461 U.S. 273, 287 (1983). And "[t]he waiver of sovereign immunity is a prerequisite to subject-matter jurisdiction[.]" *Presidential Gardens Assocs.* v. *U.S. ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999) (citing *United States* v. *Mitchell*, 463 U.S. 206, 212 (1983)). "The United States, through the FTCA, has made a limited waiver of sovereign immunity." *James* v. *United States*, No. 99 Civ. 4238 (BSJ) (HBP), 2003 WL 22149524, at *4 (S.D.N.Y. Sept. 17, 2003) (citing *Meyer*, 510 U.S. at 475). As relevant to the following discussion, however, the FTCA's waiver of sovereign immunity does not cover claims for constitutional violations or battery. *See id.* at *4 ("The FTCA waiver of sovereign immunity does not ... extend to constitutional claims."); *Josephs* v. *United States*, No. 85 Civ. 7720 (SWK), 1987 WL 5830, at *1 (S.D.N.Y. Jan. 21, 1987) ("[T]he FTCA 'does not apply' to '[a]ny claim arising out of assault [or] battery." (second alteration in original) (quoting 28 U.S.C. § 2680(h)).

### c. The FTCA's Exhaustion Requirement

The FTCA requires a plaintiff asserting "a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his [or her] office or employment" to "first present[] the claim to the appropriate Federal agency" and have the claim "finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). "This requirement is jurisdictional and cannot be waived." *Celestine* v. *Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) (citations omitted). "[T]he mere act of filing [a claim with the appropriate agency] does not necessarily fulfill the presentment requirement" for all subsequent complaints arising out of the same transaction or occurrence; instead, the claim "must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth." *Romulus* v. *United States*, 160 F.3d 131, 132 (2d Cir. 1998) (citing *Keene Corp.* v. *United States*, 700 F.2d 836, 842 (1983)).

### 2. Analysis

The Government's Rule 12(b)(1) motion argues as follows: (i) the Government enjoys sovereign immunity as to Plaintiff's constitutional claims; (ii) Plaintiff's claim that Dr. Cho continued surgery after Plaintiff withdrew his consent is a claim for battery under New York law, which claim does not fall within the FTCA's waiver of sovereign immunity; and (iii) the FTCA bars any claim for lack of informed consent that Plaintiff now alleges because he did not

exhaust his administrative remedies for such a claim. (*See* Def. Br. 25; Def. Reply 8-10). This section addresses these arguments in sequence.

### a. Sovereign Immunity Bars Plaintiff's Constitutional Claims

Plaintiff's complaint references the Fifth and Eighth Amendments to the Constitution without pointing to specific facts underlying such claims;[10] because Plaintiff's claims arose while he was in federal rather than state custody, the Court construes these claims as being brought under *Bivens*. *See Fuentes* v. *Parks*, No. 03 Civ. 2660 (RMB), 2005 WL 911442, at *3 n.6 (S.D.N.Y. Apr. 18, 2005) (*"Bivens* essentially provides for a private right of action against federal government officials for money damages for violations of constitutional rights analogous to the right of action for money damages against state officials acting under color of state law provided by 42 U.S.C. § 1983." (citation omitted)). It is settled law, however, that the doctrine of sovereign immunity bars any action for damages against the United States absent consent, and the United States has not waived its immunity to *Bivens* actions such as this one. *See Owusu* v. *Fed. Bureau of Prisons*, No. 02 Civ. 0915 (NRB), 2003 WL 68031, at *1 (S.D.N.Y. Jan. 7, 2003) (citing *Meyer*, 510 U.S. at 475). And on this basis, the Second Circuit has upheld the dismissal of *Bivens* claims against federal

---

[10] In opposition to the Government's motion, Plaintiff states that any Fifth or Eighth Amendment claims "are not raised for or as an issue in the FTCA complaint, and never [were]." (Pl. Opp. 12). But the plain text of his Complaint belies this assertion. (*See* Compl. 5 ("First, [P]laintiff requests that this Honorable Court recognize [P]laintiff[']s claims of Eighth Amendment and Fifth Amendment constitutional violations as enumerated in the Bill of Rights.")). Thus, unsure of whether Plaintiff has abandoned these claims, the Court provides the above discussion in the interest of completeness.

defendants sued in their official capacities.  *See Robinson* v. *Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994).

In the ordinary course, Plaintiff's constitutional claims would only be cognizable against the government employees responsible for the alleged violations in their individual capacities, and not against the Government itself or the Government employees in their official capacities.  *See Meyer*, 510 U.S. at 484-86; *Robinson*, 21 F.3d at 510; *Platsky* v. *C.I.A.*, 953 F.2d 26, 28 (2d Cir. 1991) (per curiam).  But under the Public Health Service Act, because Dr. Cho is a PHS employee, Plaintiff's only claim "for damage for personal injury … resulting from the performance of … dental" procedures would be an FTCA claim against the United States.  42 U.S.C. § 233(a); *see Hui* v. *Castenada*, 559 U.S. 779, 806 (2010) ("Section 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct.  By its terms, § 233(a) limits recovery for such conduct to suits against the United States.").

Accordingly, Plaintiff's claims under the Fifth and Eighth Amendment are dismissed, as the Court lacks jurisdiction over them.  *See Presidential Gardens Assocs.*, 175 F.3d at 139.

### b.      Sovereign Immunity Bars Plaintiff's Battery Claim

Plaintiff's Complaint alleges that because he could feel the pain of incisions during his surgery, he "told Dr. Cho that [he] did not want to continue with the procedure," and thereby "orally withdr[ew his] consent," but

Dr. Cho "ignored [Plaintiff] and continued the procedure." (Compl. 6). Under New York law, this allegation constitutes a claim for battery as opposed to one for lack of informed consent, and it therefore falls outside of the FTCA's waiver of sovereign immunity.[11]

On the one hand, "battery applies in the medical context only where the patient or her guardian gives *no* consent and the doctor intends to 'cause a bodily contact that a reasonably person would find offensive.'" *Armstrong ex rel. Armstrong* v. *Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 134 (2d Cir. 2005) (quoting *Jeffreys* v. *Griffin,* 1 N.Y.3d 34, 41 n.2 (2003)). "On the other hand, an informed consent violation occurs when the doctor obtains consent without giving the patient appropriate information concerning risks and alternatives." *Id.* (citing N.Y. Pub. Health Law § 2805-d). Plaintiff's claim here is clearly within the former category. *See Cerilli* v. *Kezis*, 761 N.Y.S.2d 311, 312 (2d Dep't 2003) (holding claim "sound[ed] in battery" where doctor performed biopsy on plaintiff over "express objections").

Because this claim sounds in battery, it does not fall within the FTCA's waiver of sovereign immunity, and the Government is thus immune from this claim. *See* 28 U.S.C. § 2675(a).

---

[11]    "[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof* v. *United States*, 502 U.S. 301, 305 (1992) (collecting cases). Because the facts underlying Plaintiff's claims occurred in New York, New York law controls the substance of Plaintiff's claims. *See Lopez* v. *United States*, No. 15 Civ. 9695 (GHW), 2016 WL 7156773, at *5 (S.D.N.Y. Dec. 7, 2016); *Ryan* v. *United States*, No. 15 Civ. 2248 (GHW), 2015 WL 7871041, at *4 (S.D.N.Y. Dec. 3, 2015).

### c.     The FTCA Bars Plaintiff's Informed-Consent Claim

Plaintiff alleges additional facts that are closer to an informed-consent claim than those discussed in the preceding section.  Specifically, Plaintiff contends that before consenting to the surgery, "Dr. Cho, in haste, told [P]laintiff that if he refused to have the extraction done immediately, [P]laintiff could be written up for a Disciplinary Action (due to refusal of treatment)." (Compl. 6).  In contrast, the administrative claim that Plaintiff filed and which the BOP denied, thereby allowing Plaintiff to bring this action, said nothing of Dr. Cho threatening Plaintiff with disciplinary action for refusing to undergo dental surgery.  Instead, it alleged only that Dr. Cho tried to "pull a[n] impact[ed] wisdom tooth that was infected without giv[ing Plaintiff] the proper medication to clean the infection before pulling the tooth[.]" (Dkt. #19-2).  This allegation did not provide sufficient information to the BOP to investigate whether Dr. Cho so threatened Plaintiff, and therefore did not satisfy the FTCA's exhaustion requirement.  *See Romulus*, 160 F.3d at 132.

In apparent response to the Government's argument on this point, Plaintiff provided as an attachment to his Supplemental Opposition administrative claims submitted to the BOP on February 19, 2017, March 20, 2017, and April 29, 2017, alleging that "Dr. Cho and [the United States] violated informed consent N.Y. Pub[lic] Health Law § 2805-D by failing to take a panoramic x-ray prior to the extraction of tooth #17 and violated the standard of care for treatment and injured [Plaintiff]." (Dkt. #105).  But even if those claims contained sufficient information to satisfy the FTCA's exhaustion

requirement (which the Court doubts), they were filed long after Plaintiff brought this lawsuit on September 9, 2015.

Plaintiff's informed-consent claim is therefore dismissed as this Court lacks jurisdiction over it. *See* 28 U.S.C. § 2675(a); *Celestine*, 403 F.3d at 82.

## B. The Government Is Entitled to Summary Judgment on Plaintiff's Medical Malpractice Claim

The Court proceeds to consider the merits of Plaintiff's FTCA claim for medical malpractice. Plaintiff claims that Dr. Cho breached the standard of care for the reasons stated in Dr. Schwimmer's expert report, and that those breaches proximately caused Plaintiff's pain and distress during surgery and hearing loss after the procedure. (*See, e.g.*, Compl. 3-4; Pl. Opp. 3-9). During his deposition, Plaintiff also claimed that these breaches caused numbness around the #17 tooth after the surgery. (Pl. Dep. 110:2-111:16). Rather than dispute whether Dr. Cho breached the standard of care, the Government argues that it is entitled to judgment in its favor because Plaintiff has failed to show that any alleged breaches proximately caused his alleged injuries. (*See* Def. Br. 21). Again the Court agrees.

### 1. Applicable Law

#### a. Motions for Summary Judgment Under Rule 56

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A

genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citation omitted).

### b.    Motions for Summary Judgment in *Pro Se* Cases

In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiff's noncompliance with Local Rule 56.1.  Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement. *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant … pursuant to Rule 56.1(a) … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Conversely, a non-movant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly supported facts in a Rule 56.1

Statement are denied with only conclusory assertions, the court will find such facts to be true. *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

"*Pro se* litigants are ... not excused from meeting the requirements of Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear* v. *1-800-BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)). Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record."). In this case, the Government's own Local 56.1 statement, while technically compliant, leaves something to be desired in terms of details. Thus, to be fair to both parties, the Court will rely principally on its own assiduous review of the record.

### c. Medical Malpractice

"It is well settled under New York law that '[t]he requisite elements of proof in a medical malpractice case are [i] a deviation or departure from accepted practice, and [ii] evidence that such departure was a proximate cause of injury or damage.'" *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342-43 (S.D.N.Y. 2005) (quoting *Amsler* v. *Verrilli*, 501 N.Y.S.2d 411, 411 (2d Dep't 1986)). "In order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit." *Sitts* v. *United States*, 811 F.2d 736, 739 (2d Cir. 1987). Such deviation is a proximate cause of the plaintiff's injury if it "is a substantial factor in producing the injury." *Mortensen* v. *Mem'l Hosp.*, 483 N.Y.S.2d 264, 270 (1st Dep't 1984).

New York law generally requires expert testimony to satisfy both of these elements "unless the alleged act of malpractice falls within the competence of a lay jury to evaluate." *Berk*, 380 F. Supp. 2d at 343 (quoting *Sitts,* 811 F.2d at 739). The rationale behind this requirement is the concern that "without expert assistance a jury will often have no understanding of what constitutes reasonable behavior in a complex and technical profession such as medicine." *Sitts*, 811 F.2d at 740 (quoting *Paul* v. *Boschenstein*, 482 N.Y.S.2d 870, 872 (2d Dep't 1984)). Yet "even where negligence is easily within the layman's realm of knowledge and hence properly provable without expert testimony, expert

testimony may be required to prove that the negligence was the proximate cause of the injury complained of[.]" *Id.*; *see, e.g.*, *Kennedy* v. *N.Y. Presbyterian Hosp.*, No. 09 Civ. 6256 (RMB), 2011 WL 2847839, at *4 (S.D.N.Y. July 6, 2011) ("To defeat Defendants' Rule 56 motion, Plaintiff must — but did not — submit [an] expert medical opinion supporting her theory of causation. Without such evidence, the Court must grant Defendants' motion.").

### 2. Analysis

Even viewed from the perspective of Rule 56, Plaintiff has failed to meet his burden to present expert medical evidence supporting his claim that any of Dr. Cho's alleged breaches of the standard of care proximately caused any of Plaintiff's alleged injuries. At first blush, Dr. Schwimmer's opinion might be read to suggest that Plaintiff's injuries were "a result" of Dr. Cho's "failure to complete the procedure on April 11, 2014." (Schwimmer R. 21). That, however, vastly oversimplifies the causation analysis. As an initial matter, Dr. Schwimmer offered inconsistent opinions as to why the April 11 surgery was aborted. In particular, Dr. Schwimmer testified that Dr. Cho could not complete the surgery because of the distress that Plaintiff displayed. (*See* Schwimmer Dep. 249:17-22, 256:16-24). Thus, even were one to credit the notion that it was the failure to complete the surgical procedure on April 11 that "caused" Plaintiff's injuries, it was Plaintiff's apparent distress, as much as if not more than any departure by Dr. Cho from the standard of care, that caused Dr. Cho to stop the procedure. *See Mortensen*, 483 N.Y.S.2d at 270 ("[W]here an [injury] is one which might naturally occur from causes other than

a defendant's negligence[,] the inference of his [or her] negligence is not fair and reasonable." (second alteration in original) (quoting *Cole* v. *Swagler*, 308 N.Y. 325, 331 (1955))).

In point of fact, however, the failure to complete the April 11 procedure cannot be said to have been the "cause" of any of Plaintiff's claimed injuries. On this point, Dr. Schwimmer's opinion might be read to suggest that because Dr. Cho decided to stop the surgery, Plaintiff required an additional extraction, which heightened the risk of suffering further pain in the area surrounding the #17 tooth. (*See, e.g.*, Schwimmer R. 21 ("Repeated surgeries increase the chances of causing acute pain and temporary or permanent numbness[.]")). But this heightened risk amounted to no injury at all — Dr. Schwimmer admitted that Dr. Cho's alleged breaches caused neither post-operative morbidity nor "prolonged morbidity." (Schwimmer Dep. 262:10-20). And there is neither claim nor evidence of any departures from the standard of care during the second extraction procedure on May 2, 2014.

The Court proceeds to consider Plaintiff's claimed injuries and the medical evidence (including expert testimony) concerning their cause. Dr. Schwimmer opined that Plaintiff may have suffered an injury by undergoing "a procedure that was traumatic for him." (Schwimmer Dep. 262:10-13). Significantly, however, Dr. Schwimmer did not opine that Plaintiff suffered any more trauma during the April 11 procedure than he would have suffered absent any alleged departures from the standard of care by Dr. Cho. And, tracing the causal chain back one link, Plaintiff attests that his trauma

resulted from the anesthesia failing (*see, e.g.*, Pl. Dep. 158:13-14), yet neither Plaintiff nor Dr. Schwimmer contends that Dr. Cho breached the standard of care by failing to administer anesthesia properly. Even if Plaintiff had so alleged, Dr. Schwimmer admitted that a patient could experience "pain at the surgical site" even if he or she were anesthetized such that they "represent that [they] ha[ve] numbness" and "even though [a doctor has] objective findings of numbness." (Schwimmer Dep. 295:10-18).[12] Any pain or distress that Plaintiff suffered during the procedure therefore cannot be traced to, and was not proximately caused by, Dr. Cho's alleged departures from the standard of care.

Plaintiff's remaining injuries are his claimed post-operative numbness and hearing loss. As to the latter, the record evidence suggests overwhelmingly that Plaintiff is not suffering from any hearing loss. *See supra* at 9-12. In any event, Dr. Schwimmer made clear that he could *not* declare to a reasonable degree of medical certainty that Dr. Cho's alleged breaches caused the numbness or any loss of hearing. (*See* Schwimmer Dep. 286:12-287:15). Indeed, as mentioned above, Dr. Schwimmer testified that Dr. Cho's alleged

---

[12] Given Dr. Schwimmer's admission that this injury could result even with proper anesthesia, Plaintiff's reliance on the *res ipsa loquitur* doctrine is unavailing, as Plaintiff is unable to make the required showing that this injury "does not ordinarily occur in the absence of negligence." *Antoniato* v. *Long Island Jewish Med. Ctr.*, 871 N.Y.S.2d 659, 661 (2d Dep't 2009). Further, given that Plaintiff purports to have a full recollection of the surgery, this case is a far cry from the usual application of *res ipsa loquitur* in cases involving anesthesia, where the patient tends to suffer an unusual injury while unconscious. *See, e.g.*, *Gonzalez* v. *Arya*, 33 N.Y.S.3d 463, 465-66 (2d Dep't 2016) (holding *res ipsa loquitur* applicable where patient contracted hepatitis C while under anesthesia); *Swoboda* v. *Fontanetta*, 17 N.Y.S.3d 50, 53 (2d Dep't 2015) (holding *res ipsa loquitur* applicable where patient allegedly suffered broken clavicle while under general anesthesia for arthroscopic shoulder surgery); *Kerber* v. *Sarles*, 542 N.Y.S.2d 94, 95 (4th Dep't 1989) (holding *res ipsa loquitur* applicable where patient was under general anesthesia for foot surgery during which her teeth were knocked out).

breaches caused neither post-operative morbidity nor "prolonged morbidity." (*Id.* at 262:10-20).

In sum, even assuming that Dr. Cho departed from the standard of care, no reasonable jury could find that his departure proximately caused any of Plaintiff's alleged injuries. The Government is therefore entitled to summary judgment.

## CONCLUSION

Given the foregoing, the Government's motion to dismiss for lack of subject matter jurisdiction and for summary judgment is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:　　　March 5, 2018
　　　　　　New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge


*Sent by First Class Mail to:*
Anthony Mayes
Reg. No. 65259-053
USP Terre Haute
U.S. Penitentiary
Unit SHU
P.O. Box 33
Terre Haute, IN 47808